UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>    vs.<br><br>RYAN BISSONETTE,<br><br>                 Defendant. | 5:14-CR-50055-JLV<br><br>REPORT AND RECOMMENDATION |

Pending is Defendant's Motion to Suppress Evidence (Doc. 96). An evidentiary hearing was held on Wednesday, October 28, 2015. Defendant was personally present and represented by his attorney of record, Stephen Demik. The Government was represented by Eric Kelderman. Three witnesses testified at the hearing. Seventeen exhibits were received into evidence. Both parties have submitted briefs and oral argument was heard at the conclusion of the hearing. The following is this court's recommended disposition.

## **JURISDICTION**

Defendant is charged in an Indictment with Aggravated Sexual Abuse by Force in violation of 18 U.S.C. §§ 1153, 2241(a)(1), and 2246(2)(C); and Sexual Abuse in violation of 18 U.S.C. §§ 1153, 2242(2), and 2246(2)(C).[1] The pending Motion was referred to this magistrate judge for the holding of an evidentiary hearing and the issuance of a recommended disposition pursuant to 28 U.S.C.

---

[1] Defendant was also charged with a third count, Aggravated Sexual Abuse of a Minor in violation of 18 U.S.C. §§ 1153, 2241(c), and 2246(2)(C) in a Superseding Indictment, but this count was severed. (Docket. 87).

1

§ 636(b)(1)(B) and Honorable Jeffrey L. Viken's Standing Order dated March 9, 2015.

## FACTUAL BACKGROUND

In the early morning hours, at approximately 4:00 a.m. on August 8, 2013, Jackie Janis reported to law enforcement that she had been sexually assaulted. She told the officers that a man had offered her a ride home in his pickup truck,[2] but instead, he took her outside of town and sexually assaulted her. During the assault, Janis struck the man with a small portable propane tank and got out of the vehicle. (Docket 111 at p. 6). Instead of being left alone outside of town, Janis jumped into the bed of the pickup truck as it drove off. When the truck approached a trailer court, Janis jumped out. Janis said she left behind a sandal and a part of her cellular phone. (Docket 111 at p. 95). She later described the sandal to law enforcement as a white sandal with yellow straps. Id. Janis approached some bystanders asking if they knew the identity of the man who was driving the pickup truck. (Docket 111 at p. 7). The bystanders gave Janis the name[3] of the suspect, as well as identified him as a mechanic that lives in East Ridge housing. (Docket 111 at p. 7). When the bystanders refused to help Janis, she walked toward the convenience store and contacted law enforcement. After interviewing Janis, law enforcement drove Janis through the trailer court so she could identify where she got out of the truck and at which trailer the bystanders were located. Id. Law enforcement then took Janis to Indian Health Services to get medical attention.

---

[2] Janis described the pickup as "black or dark" in color. (Docket 97 p. 2).
[3] Janis was unable to recall the name of the suspect.

Law enforcement responded to an unrelated service call.  Thereafter, Officer David Whary and Officer Jack discussed possible suspects in the Janis assault.  They identified Dominic Waters and Ryan Bissonette as two mechanics who lived in the East Ridge housing area.  Law enforcement drove by Dominic Waters residence and took photographs of a black GMC Jimmy and a dark colored Sonoma pickup truck which were parked at the Dominic Waters' residence.  (Exhibit 3, 4).  Officer Whary went to the police department and printed five photos of individuals to show Janis.  Officer Whary initially selected the photos of Dominic Waters and Ryan Bissonette because they were mechanics who lived in East Ridge.  Three other photos depicting Native American males with short hair that had a similar look were also included in the photo lineup.  Law Enforcement took the photographs of the pickup truck and suspects to Janis at Indian Health Services.

Janis was also shown a blurry photograph of a dark color Sonoma pickup truck, which was parked at the residence of Dominic Waters.  (Docket 111 at 30-31; Exhibit B).  Janis identified it as the vehicle she was attacked in earlier that morning.[4]

Based on Janis' identifications, Officer Whary and Officer Jack obtained a tribal search warrant to search a black 1995 GMC Sonoma truck at #76 East Ridge. Oglala Sioux Tribe Department of Public Safety officers along with Bureau of Indian Affairs (BIA) agents, served the search warrant to Dominic Waters who lived at a house on G Street in East Pine Ridge on August 8. (Doc.

---

[4] Janis was incorrect about the pickup truck.  It was later determined that the attack occurred in a black Chevy pickup truck.

3

97 at p. 2).  The search team found nothing.  Dominic Waters pointed law enforcement to a trailer up the street where another dark colored truck, belonging to Ryan Bissonette, was located.  (Docket 111 at p. 17, 31).   BIA Agent Justin Hooper, Officer Whary and Officer Jack went to Mr. Bissonette's residence. (Docket. 97 at p. 2). They did not have a warrant to search his premises. (Docket 111 at p. 29).

The Bissonette residence is surrounded by a fence on all four sides, excepting only the driveway which is unobstructed by either a fence or a gate. (Docket 111 at 32, 36).  A person may travel uninhibited into the driveway, which is the route one would travel to approach the trailer house.  Mr. Bissonette's black pickup truck was parked in the driveway.  (Docket 111 at p. 18, 36).  The pickup truck was not in an enclosure, garage, shed or fence. (Docket 111 at p. 19).

During the evidentiary hearing, the witnesses drew a map depicting the location of the pickup truck, trailer house, and the travel routes of the officers. However, the map was not marked or offered into evidence.  The testimony during the hearing establishes that the trailer house Bissonette was residing in is located to the left of the pickup truck as shown in Exhibit 9.  The brown house in Exhibit 6 is the neighboring property.  Therefore, the driver's side of the pickup truck would be closest to the Bissonette residence.  The most direct walkway from a person traveling to the Bissonette residence would be to pass the pickup truck on the driver's side.

4

Officer Whary and Officer Jack approached the Bissonette trailer by walking up the driveway.  Officer Whary walked directly up the driveway between the driver's side of the door and the Bissonette residence and went to the front door of the trailer house.  While Officer Whary was approaching the trailer, Officer Jack visually inspected Mr. Bissonette's black truck. (Docket 111 at pp. 36, 68). Officer Jack testified that he "kind of peeked in there" to see if Mr. Bissonette was in the vehicle.  (Docket 111 at p. 116).  Without entering or touching the vehicle, Officer Jack observed a white sandal with yellow straps inside the pickup truck. (Docket 111 at p.126).  The sandal is depicted in Exhibit E.  Officer Jack told the other officers that he observed Janis' sandal in the back seat of the truck.  (Docket 111 at p. 157).

There was conflicting testimony regarding whether Officer Jack walked past and inspected the truck only on the driver side, or if he walked entirely around the vehicle and inspected it from the passenger side.  Officer Whary testified that Officer Jack walked around both sides of the truck prior to approaching the trailer.  (Docket 111 at p. 68).  Officer Jack testified that he saw the sandal from the driver's side of the vehicle.  (Docket 111 at p. 121, 174)(stating, "I believe I went on the driver's side").  When informed of Officer Whary's contradictory testimony and given an opportunity to clarify, Officer Jack's response was "It just happened a couple of years ago."  (Docket 111 at 175).  Agent Hooper testified it appeared to him that Officer Jack circled around the vehicle before they approached the trailer.  (Docket 111 at p. 191,

5

195).  Exhibit 8 depicts the location of the sandal. [5]   Consistent with the location of the sandal and its view being blocked by a child's car seat, Officer Jack's view of the sandal would have been from the passenger side of the vehicle.  This is also consistent with Officer Whary and Agent Hooper's testimony.  The court resolves the factual dispute and finds that Officer Jack walked around the truck and viewed the sandal from the passenger side of the vehicle.

While Officer Jack was looking into the pickup truck, Officer Whary walked past the driver's side of the black pickup truck and approached the front door of the trailer.  Family members answered the door and Officer Whary asked if Mr. Bissonette was home.  Family members woke Mr. Bissonette from his sleep; Mr. Bissonette approached Officer Whary who then stepped into the entryway, advised Mr. Bissonette he was being detained, and placed handcuffs on him.  (Docket 111 at p. 64).  Officer Whary informed Mr. Bissonette that he was not under arrest.  (Docket 111 at pp. 64, 67). Officer Whary brought Mr. Bissonette outside and Agent Hooper asked Mr. Bissonette if the black truck in the driveway was his and for consent to search the truck.  (Docket 111 at pp. 65-66).  Mr. Bissonette was asked for consent to search the pickup truck in less than five minutes from when he had been roused from his sleep.  (Docket 111 at pp. 23, 161-162, 190).  Mr. Bissonnete had the odor of alcohol on him.

---

[5] Exhibit 8 is of poor quality because it contains the reflection of Officer Jack taking the photograph through the passenger side window.  Upon careful study, it shows the white flip flop sandal with yellow straps resting upside down on the seat next to the backrest of the seat. Also in Exhibit 8 is the image of a person looking through the driver's side window with their hands up next to their face so they could get a clear look into the vehicle.  This depicts how difficult, if not impossible, it would be to view the sandal from the driver's side of the vehicle.

(Docket 111 at pp 188-189).  While there was testimony that Mr. Bissonette did not appear intoxicated, Agent Hooper did not feel comfortable letting him drive to the subsequent interview at the BIA office given the odor of alcohol.  (Docket 58 at pp 81-82).  Mr. Bissonette was uncuffed so he could sign the consent to search form.

While Agent Hooper was talking to Mr. Bissonette, Officer Jack photographed the sandal while looking through the passenger window of the truck.  (Docket 111 at pp. 151-152; Exhibit 8).  At the time Officer Jack was conducting the second visual search and photographing the vehicle, the other officers had removed Mr. Bissonette's handcuffs and were talking to him.  Id. at 151, 154.  Officer Jack didn't see Mr. Bissonette sign the consent form.  Id. at 119, 152.  When asked if he could hear what we being said between Agent Hooper and Mr. Bissonette, he testified, "Not clearly, no."  Id. at 119.  Officer Jack explained

> A:     At this point they took his handcuffs off and they were talking with him.  I figured, might as well get some pictures while we're here, and that's why I started taking pictures of the vehicle.
>
> Q:     Did you ask him [sic] permission to look inside and take photographs?
>
> A:     No. But I figured with the sandal inside, it might be good to get a picture of it.

Id. at154.

Mr. Bissonette was allowed to assist his girlfriend in removing child care items from the truck.  However, Mr. Bissonette was then was placed in a patrol car until the search of the vehicle was completed because he was acting fidgety and agitated.  (Docket 111 at p. 24, 67).   The officer's seized a white sandal with yellow straps and part of a black cell phone.

## DISCUSSION

### A.     Whether the Evidence Seized from Mr. Bissonette's truck was in violation of the Fourth Amendment

Mr. Bissonette argues that evidence seized from his truck should be suppressed because the officers did not have a warrant and the truck was located in the curtilage of his home. Furthermore, Mr. Bissonette did not give voluntary consent to the officers for the search of his vehicle because he had just been woken up, handcuffed, and escorted outside. The government argues that the officers did not conduct a Fourth Amendment search by looking in the car window because a driveway is not curtilage and the officers could lawfully look in the window and see the sandal in "plain view." The government also argues that Mr. Bissonette gave voluntary consent to search his vehicle.

### 1.     Whether Mr. Bissonette gave consent.

When a defendant claims he did not voluntarily consent to a search, the Government bears the burden of proving consent was voluntarily given.  United States v. Sanders, 341 F.3d 809, 817 (8th Cir. 2003).  The standard of proof is a preponderance of the evidence.  Lego v. Twomey, 404 U.S. 477 (1972).

It should be noted that even if Mr. Bissonette made statements in the absence of Miranda warnings, it does not necessarily follow that Mr.

8

Bissonette's consent to search the pickup truck is invalid, or must be suppressed in the absence of Miranda warnings. "[A] consent to search is not an incriminating statement." Cody v. Solem, 755 F.2d 1323, 1330 (8th Cir. 1985), cert. den. 474 U.S. 833 (1985). And "even persons who have been arrested and are in custody can voluntarily consent to a search . . ." United States v. Chaidez, 906 F.2d 377, 382 (8th Cir. 1990).

Consent to search is valid if the "totality of the circumstances demonstrates that the consent was voluntary." United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990). The Government must prove voluntariness by a preponderance of the evidence. Id. Consent is voluntary if it is the product of the free and unconstrained choice of its maker, rather than duress or coercion. Id. The totality of the circumstances which should be considered include both the characteristics of the accused and the details of the interrogation. Id. at 380-81. The characteristics of the accused which should be considered are: (1) his age; (2) his general intelligence and education; (3) whether he is intoxicated or under the influence of drugs when consenting; (4) whether he had been informed of his Miranda rights when consenting; (5) his previous experience with the criminal justice system. Characteristics of "the environment in which consent was given" include: (1) whether the interrogation was lengthy; (2) whether the suspect was threatened or physically intimidated; (3) whether the suspect relied on any promises or misrepresentations by law enforcement officers; (4) whether the suspect was in custody or under arrest when consent was given; (5) whether the suspect was in a private or secluded place when

9

consent was given; and (6) whether he objected or stood silently by while the search occurred.  Id. at 381.

Mr. Bissonette is age 34 (Docket 111 at p. 232).  He dropped out of Pine Ridge High School after the 11th grade and did not get his GED.  (Docket 111 at p. 235).  He has minimal experience with the criminal justice system, as he has no criminal record other than tribal arrests.  (Docket 111 at pp. 234-235).  He has no prior experience with legal issues such as consent and search.  (Id.)

Mr. Bissonette was taken outside, placed in handcuffs and as asked for permission to search his car, all in less than 5 minutes after being roused from his sleep.  Mr. Bissonette smelled of alcohol, but didn't appear to be intoxicated.  However, no PBT or sobriety tests were done to determine the level of intoxication. Agent Hooper did not feel comfortable allowing Mr. Bissonette to drive to the BIA office for questioning.  Mr. Bissonette was not informed of his Miranda rights or that he could refuse consent.  Shortly after the search began, Mr. Bissonette became agitated and fidgety and was placed in the police car during the remainder of the search.  These facts weigh in favor of a finding that the consent was not a free and unconstrained choice.  While there is no evidence that law enforcement made promises or misrepresentations to Mr. Bissonette, the other factors demonstrating duress outweigh the absence of overt threats or promises.  Based on the totality of the circumstances, the government has failed to establish by a preponderance of the evidence that consent was voluntary.

### 2.    Warrantless search of the vehicle

Warrantless searches are *per se* unreasonable under the Fourth Amendment, "subject only to a few specifically established and well-delineated exceptions." <u>Bynum</u>, 508 F.3d at 1136-37 (8th Cir. 2007). The government asserts the search falls within the plain view doctrine.

"Under the plain view doctrine, a police officer's warrantless seizure does not violate the Fourth Amendment if the officer's conduct satisfies three criteria.  First, the officer must not violate the Fourth Amendment in arriving at the vantage point from which he plainly views the evidence.  Second, the object's incriminating nature must be immediately apparent to the officer.  Third, the officer must have a legal right of access to the object." <u>United States v. Beatty</u>, 170 F.3d 811 (8th Cir. 1999) (internal citations omitted).

Mr. Bissonnette argues that the pickup truck was located in the curtilage of the home and protected by the Fourth Amendment.  The government asserts that the pickup truck was located in the driveway, and therefore No Fourth Amendment search occurred.

### a.    Vantage point

In order for the evidence to be admissible under the plain view exception, law enforcement must not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. <u>United States v. Hughes</u>, 940 F.2d 1125, 1126-27 (8th Cir. 1991) (quoting <u>Horton v. California</u>, 496 U.S. 128, 138-40 (1990)).  The Fourth Amendment protects a person's home and the area immediately around it to which "the intimate activity

11

associated with the sanctity of a man's home and privacies of life" extend. Oliver v. United States, 466 U.S. 170, 180 (1984).  This protection, however, does not extend past the curtilage.  "Curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life, and is typically comprised of land adjoining a house, often within some type of enclosure such as a fence."  Id.  The 'centrally relevant consideration' in any curtilage determination is 'whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection.'"  United States v. Wells, 648 F.3d 671 (8th Cir. 2011) (quoting United States v. Dunn, 480 U.S. 294, 301 (1987)).

In determining whether an area is within the curtilage of the home, the court is to consider four factors, "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.  United States v. Dunn, 480 U.S. 294, 301 (1987).  When applying the Dunn factors, they are not to be applied mechanically or in isolation. United States v. Gerard, 362 F.3d 484, 488 (8th Cir. 2014).

In cases where the reasonable-expectation-of-privacy test applies, the burden is on the defendant to demonstrate that he had a subjective expectation of privacy and that his expectation is one that society recognizes as objectively reasonable.  United States v. James, 534 F.3d 868, 872-73 (8th Cir. 2008).  Accordingly, to demonstrate a violation of his Fourth Amendment

rights, Mr. Bissonette must demonstrate that the area from where the officers viewed the sandal was part of the curtilage of his home and as such, he had an objective reasonable expectation of privacy.

In United States v. Weston, 443 F.3d 661 (8th Cir. 2006), the Eighth Circuit reaffirmed its position that no Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors-such as driveways, walkways, or similar passageways.  443 F.3d 661, 667 (citing Untied States v. Reed, 733 F.2d 492, 501 (8th Cir. 1984)).  In Weston, law enforcement went to Weston's residence to investigate reports that stolen vehicles were located on the property.  Id. at 664.  Law enforcement entered the driveway traveling approximately 200 feet and parking at a split rail fence.  The officers observed many junk vehicles, but did not observe any stolen vehicles.  The officers continued their investigation and proceeded beyond the split rail fence to the front door of the mobile home.  They intended to do a knock and talk, inquire about the stolen vehicles, and seek consent to search the rest of the property. The officers approached the front door. However, sitting next to the front door and leaning against the split rail fence was evidence of methamphetamine manufacturing items.  Weston moved to suppress the evidence.  The Court held that the officer's entry onto the curtilage was a limited intrusion upon his privacy interests in furtherance of a legitimate law enforcement objective and therefore not unreasonable.  Id. at 667.

13

In <u>United States v. Robbins</u>, 682 F.3d 1111 (8th Cir. 2012), the Eighth Circuit reached as similar result.  Law enforcement received a 911 "hang-up" call.  Return calls to the number went unanswered.  At approximately 10:00 p.m., law enforcement arrived at the location they believed the call had been traced to.  Both responding officers pulled into the driveway and observed a residence with interior and exterior lights on.  No unusual sounds or signs of disturbances were present.  Officer walked up the driveway and approached the residence.  Officers walked through the wide open gate to the breezeway and knocked on the front door, receiving no response.  Because so many lights were on and it appeared that somebody was home, officers conducted a quick perimeter check by walking around the residence.  They returned to the front door, knocked again, and received no response.  However, officers smelled the order of marijuana which provided the basis for a search warrant for the residence which ultimately produced evidence of a marijuana growing operation.  The defendant moved to suppress on the grounds that the evidence providing probable cause for the search warrant was obtained within the constitutionally protected curtilage area.  Like <u>Weston</u>, the Court held that the search did not run afoul of the Fourth Amendment because the officers acted in furtherance of a legitimate law enforcement object and their intrusion was appropriately limited.  The Court made note that the officers entered the property through the normal access route for any visitor to the house; they first attempted to reach the homeowner at the front door; after receiving no

response, the officers conducted a short, minimally intrusive exterior perimeter search for someone in need of assistance.  Id. at 1116.

However, in United States v. Wells, 648 F.3d 671 (8th Cir. 2011), the Eighth Circuit reached a different result.  In the Wells case, law enforcement was investigating a confidential informant tip that Wells was manufacturing methamphetamine in an outbuilding behind his house.  648 F.3d at 673.  Law enforcement drove past Wells' property several times and on the fourth trip observed open doors in the middle of the night on both a camper parked in the street and on a shed behind the house.  Id.  Law enforcement decided to do a knock-and-talk at Wells' house.  Wells' house was fenced along three sides of the property.  A paved driveway led from the street to a carport and a paved walkway lead from that driveway to the front door.  An unpaved driveway also ran from the street along the eastern side of the house and into the backyard to a shed in the back.  Id.  Law enforcement arrived at the property; one officer looked inside the camper parked in the street while the other walked down the unpaved driveway to look in the backyard shed.  Officers found nothing.  They regrouped on the unpaved driveway near the rear of the house.  From there they saw a light on in another outbuilding, so they walked across the backyard to the lighted door of the outbuilding.  The officers knocked on the door and when the occupants opened the door, law enforcement smelled marijuana and observed a bag of marijuana on a table.  Id. at 674.  Law enforcement later obtained a warrant which the resulting search produced evidence of the manufacture of methamphetamine.  Wells moved to suppress the evidence on

15

the grounds that the officer violated his Fourth Amendment rights when the officers first entered the protected curtilage of his house (his backyard) without a warrant.  The district court granted the motion to suppress.  The district court found that Wells had protectable expectation of privacy in the entirety of the property behind his residence and rejected the government's argument that the driveway invited the general public and police to enter the premises.

The Eighth Circuit held that even under a *de novo*[6] review, the portion of Wells' driveway extending past the rear of his home and into the backyard is part of the home's curtilage.  Id. at 676-77.  The Court noted that the officers stood in the unpaved driveway on the portion which extended past the rear of Wells' home and into the backyard, which contained a child's wagon and sled, a boat, a lawnmower, a rabbit hutch, and a burn barrel.  Id. at 677.  The Court rejected the government's argument that the visibility from the street of the entire unpaved driveway should deprive Wells of any reasonable expectation of privacy.  Id. at 678.  The Court stated:

> Similarly, we think that a homeowner may still maintain some expectation of privacy in those areas.  In this case, for example, Wells certainly exposed his unpaved driveway to the public view, and therefore could not reasonably expect that members of the public would not observe whatever he might do there.  But he could reasonably expect that members of the public would not traipse down the drive to the back corner of his home, from where they could freely observe his entire backyard.

Id.  After determining that law enforcement entered onto the curtilage, the Eighth Circuit considered whether the entry was constitutionally

---

[6] The Court noted a conflict in its previous holdings whereby some reviews were conducted with a clearly erroneous standard while others employed a *de novo* review.

reasonable.  Id. at 679.  The Court considered the knock and talk rule which recognizes that "'no Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors—such a driveways, walkways, or similar passageways." Id. (quoting United States v. Reed, 733 F.2d 492, 501 (8th Cir. 1984).  Citing two previous cases, the Court noted that no Fourth Amendment violation exists when a police officer first attempts to unsuccessfully reach the homeowner at the front door, and then extends his movements into other areas of the curtilage such as the backyard.  Id. at 679-80 (citing United States v. Anderson, 552 F.2d 1296, 1300 (8th Cir. 1997); United States v. Raines, 243 F.3d 419, 420 (8th Cir. 2001)).  However, the Court noted that it has never found consent where officers made no attempt to reach the homeowner at the front door.  Id. at 679.  Because law enforcement made no attempt to contact Wells at the front door, but instead first walked to the back corner of the home, the Court found that the officer's entry was not justified as a "knock-and-talk." Id. at 680 (stating, "Other than perhaps their suspicion of drug manufacturing, there was no reason for the officer to think that Wells would be found in the backyard at that time, nor was there any reason for them to think that Wells generally receive 'visitors' there.  That the officers were standing on a 'driveway,' Reed, 733 F.2d at 501, is not a sufficient answer.")

After careful review of the facts leading up to the search of Mr. Bissonette's pickup truck, the court concludes that it presents a case which is more similar to Robbins and Weston than to Wells.  The constitutionally

impermissible facts found in <u>Wells</u>, such as law enforcement extending their movements to the rear of the home without any attempt to locate a homeowner at his front door are not present in Mr. Bissonette's case.

The <u>Dunn</u> factors applied to this case are as follows:

      1)    Proximity of the area claimed to be curtilage to the home

The area from where Officer Jack visually searched the pickup truck is the driveway to the Bissonette residence.  There was no evidence presented at the hearing regarding distances between the driveway and the residence.  The photographs do not allow the court to draw any conclusion that the passenger side of the pickup truck is in close proximity to the home.

      2)    Whether the area is included within an enclosure surrounding the home

The entire Bissonette residence is enclosed by a fence, excepting only the portion from which a person accessing the driveway from the street.  The fence consists of sizable wooden fence posts spaced several feet apart with metal wire fencing material.  The pickup truck was parked in the driveway which was located within the fence.

      3)    The nature of the uses to which the area is put

The photos demonstrate that the driveway is not a clearly defined area as the dirt driveway gives way to weeds.  Off to the passenger side of the vehicle, additional tire tracks are visible indicating that the pickup truck is clearly parked in the portion of the dirt driveway.  The pickup truck is located in a place where Mr. Bissonette would reasonably expect to receive visitors and where they would park.  No evidence was presented that the driveway

18

contained items used for "the intimate activity associated with the sanctity of [his] home and the privacies of life." <u>Wells</u>, 648 F.3d at 677.  While there are building materials and a trampoline depicted in the photographs, there was no evidence presented that law enforcement wandered into or searched the areas containing these items.

    4)    The steps taken by the resident to protect the area from observation by people passing by

    The fence is transparent which demonstrates that Mr. Bissonette took little to no steps to protect the area from passerby observations.  However, in the back corner and along the yard, plywood and boards are placed along the fence line demonstrating a small attempt to shield the view of the back and side yard.  There is no garage or outbuilding shielding the pickup truck.  All of the photographs demonstrate that Mr. Bissonette's truck, parked in the driveway, was readily observable by and accessible to any passerby.  Officer Jack testified that the public could walk in off the street and have access to the pickup truck.  (Docket 111 at p. 220).

    The only factor weighing in favor of the driveway being curtilage is the fact that the entire property is surrounded by a fence.  However, the fence is not designed to limit the observation of those passing by and visitors who wished to approach the residence would do so by traveling up the driveway. The remaining <u>Dunn</u> factors support a finding that the area from which Officer Jack observed the sandal was not curtilage.

    Even assuming the driveway was within the curtilage of the home, the search still does not violate the Fourth Amendment.  Officer Whary and Officer

Jack walked up the driveway with a legitimate law enforcement objective, to-wit: conducting a knock and talk with Mr. Bissonette.  Officer Whary went straight to the front door to locate Mr. Bissonette.  However, Officer Jack deviated from the most direct path from the driveway to the front door, by circling around Mr. Bissonette's black pickup truck.  There is no evidence in the record that Office Jack was anywhere other than the driveway when he looked into the pickup truck.  Eighth Circuit case law is very clear that "no Fourth Amendment search occurs when police who enter private property restrict their movements to those areas generally made accessible to visitors- such as driveways, walkways or similar passageways."  United States v. Reed, 443 F.3d 661 (8th Cir. 2006).  "The act of looking through a car window is not a search for Fourth Amendment purposes because a person who parks a car— which necessarily has transparent windows—on private property does not have a reasonable expectation of privacy in the visible interior of his car." United States v. Bynum, 508 F.3d 1134, 1137 (8th Cir. 2007) (quoting United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995) (internal quotations omitted)).

The only question remaining is whether by circling around the pickup truck or not taking the most direct path while on the driveway, Officer Jack ran afoul of the Fourth Amendment.  First, it should be noted that the record contains scant evidence regarding the location of the pickup truck on the driveway, the paths taken by law enforcement, and whether the officers failed to restrict their movements to those areas made accessible to visitors. "Because the defendant 'bears the burden of proving a Fourth Amendment

20

violation,' it is he 'who shoulders the consequences of an insufficiently developed record.'" United States v. Long, 30 F.Supp. 835, 849 (D.S.D. 2014) (quoting United States v. Esquivel-Rios, 725 F.3d 1231, 1239 (10th Cir. 2013)). Furthermore, Mr. Bissonette has failed to cite and the court is unable to locate case law which stands for the proposition that when walking up the driveway to perform a knock and talk, law enforcement must take the most direct path while on the driveway.

Mr. Bissonette has failed to meet his burden by a preponderance of the evidence that law enforcement violated the Fourth Amendment in arriving at the place from which the evidence was plainly viewed.

### b.   Incriminating nature must be immediately apparent

The incriminating character of an item is immediately apparent if "the officer performing the search has probable cause to believe an item is incriminating." United States v. Muhammad, 504 F.3d 1022, 1027 (8th Cir. 2010) (quoting United States v. Green, 560 F.3d 853, 858 (8th Cir. 2009) (internal citations omitted)). Probable cause requires "that the facts available to a reasonably cautious man would warrant a belief that certain items may be contraband or stolen property or useful as evidence of the crime." Muhammad, 504 F.3d at 1028 (quoting Green, 560 F.3d at 858). Absolute certainty is not required. Muhammad, 504 F.3d at 1027.

In Muhammad, a man robbed a credit union and stole $2000. The agent identified Muhammad from the credit union's security videos and saw him entering and exiting the credit union before speaking to the person that

committed the robbery. The agent saw the two men go to an apartment complex and officers found both men in the complex less than an hour after the robbery. After conducting a pat down search of Muhammad under <u>Terry</u>, the agent felt what he thought could have been a weapon, but turned out to be Muhammad's wallet. The agent saw cash protruding from the wallet. Though cash is not "inherently incriminating," under the circumstances, the agent had probable cause to believe the cash was evidence of the robbery. The agent lawfully seized the cash under the plain view exception to the Fourth Amendment's warrant requirement.

Law enforcement was lawfully in Mr. Bissonette's driveway. They were conducting an investigation where a crucial piece of evidence was a sandal. Janis informed law enforcement that she left a white sandal with yellow straps in the pickup truck. (Docket 111 at p. 108). Given the specific information about the sandal and the relatively short timeframe in which it was located, the court concludes that the incriminating character was immediately apparent given the circumstances surrounding the investigation.

### c.    Lawful right of access to the object itself

Since the court previously found that Mr. Bissonette's consent was not voluntary, it must consider whether some other right of access to the white sandal existed. In <u>United States v. Brown</u>, the Eighth Circuit considered a factually similar case. 653 F.3d 656 (8th Cir. 2011). In <u>Brown</u>, three stabbing victims reported that they were assaulted by Patricia Brown who was driving a blue Chevy Blazer. 653 F.3d at 660. While investigating another matter at the

22

residence of Yvette Lussier, law enforcement came across Patricia Brown who was immediately placed into custody and taken to jail. Id. at 661. Law enforcement returned to the Lussier residence to investigate the blue Chevy Blazer which was parked in the Lussier driveway. Law enforcement peered through the windows with a flashlight and saw a knife and brass knuckles. The officer opened the doors and photographed the items without disturbing them. The blazer was then towed and a warrant to search the vehicle was then obtained. Brown moved to suppress the knife and brass knuckles because he viewed and photographed the evidence without a warrant or consent. The Eighth Circuit held that the plain view exception to the warrant requirement applied. The court stated, "Given the violent events of the night in question, [the officer] then had probable cause to enter the parked—but highly mobile—vehicle, without a warrant, and to seize the weapons he observed inside it." Brown, 653 F.3d at 662 (citing United States v. Brown, 806 F.2d 204, 207-08 (8th Cir. 1986). Mr. Bissonette had a reduced expectation of privacy because the property being searched was an automobile. Janis reported that while being assaulted a few hours earlier, she had left her white sandal with yellow straps in her attacker's vehicle. The observation of the white sandal with yellow straps establishes a finding of probable cause. Therefore, like the Brown case, law enforcement had a lawful right to access the object itself.

It should also be noted that "where the elements of the plain view doctrine are met, the fact that the officers could have left and obtained a

warrant does not invalidate the justification for seizing the property." <u>PPS, Inc.</u>
<u>v. Faulkner Cty., Ark.</u>, 630 F.3d 1098, 1106 (8th Cir. 2011).

Therefore, the court concludes that law enforcement did not violate the
Fourth Amendment in arriving at the vantage point from which they plainly
viewed the white sandal; the white sandal's incriminating nature was
immediately apparent to the officer; and the officers had a legal right of access
to the object.

### **CONCLUSION**

It is respectfully recommended that Mr. Bissonette's motion to suppress
evidence seized from the Defendant's truck (Docket 96) be denied in its
entirety.

### **NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this Report and
Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1),
unless an extension of time for good cause is obtained.  Failure to file timely
objections will result in the waiver of the right to appeal questions of fact.
Objections must be timely and specific in order to require de novo review by the
District Court.  *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990); *Nash v. Black*,
781 F.2d 665 (8th Cir. 1986).

DATED this 2nd day of May, 2016.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge

24