UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                     Plaintiff,<br><br>      vs.<br><br>RYAN BISSONETTE,<br><br>                     Defendant. | CR. 14-50055-JLV<br><br>ORDER ADOPTING REPORTS AND<br>RECOMMENDATIONS |

**INTRODUCTION**

On June 17, 2014, a grand jury indicted defendant Ryan Bissonette for count I: aggravated sexual abuse by force in violation of 18 U.S.C. §§ 1153, 2241(a)(1) and 2246(2)(C) and count II: sexual abuse in violation of 18 U.S.C. §§ 1153, 2242(2) and 2246(2)(C).   (Docket 2).   On August 26, 2015, Mr. Bissonette filed a motion to suppress evidence seized from his pickup and a motion to exclude eyewitness identification testimony.   (Dockets 96 & 98).   The motions were referred to United States Magistrate Judge Daneta Wollmann pursuant to       28 U.S.C. § 636(b)(1)(B) and the standing order of March 9, 2015.   The magistrate judge held an evidentiary hearing on October 28, 2015. (Docket 108).

On June 2, 2016, Magistrate Judge Wollmann issued a report and recommendation on the motion to suppress ("Suppression R&R") and a report and recommendation on the motion to exclude eyewitness identification testimony ("Identification R&R").   (Dockets 115 & 116).   The defendant timely

filed objections to the Identification R&R and the government timely filed objections to the Suppression R&R.[1]   (Dockets 117 & 120).

Under the Federal Magistrate Act, 28 U.S.C. § 636(b)(1), if a party files objections to the magistrate judge's proposed findings and recommendations, the district court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."   Id.   The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."   Id.

The court completed a *de novo* review of those portions of both of the reports and recommendations to which objections were filed.   For the reasons stated below, the objections of both parties are overruled and the Suppression R&R and the Identification R&R are adopted in full.

## ANALYSIS

### OBJECTIONS

Mr. Bissonette filed two objections to the Identification R&R.   (Docket 117).   Those objections claim the magistrate judge erred in finding Mr. Bissonette failed to meet his burden of proof that the photographic line-up was impermissibly suggestive because:

1.   The photographs which were retained show the defendant was engaged in wrongdoing or was the suspect; and

---

[1]Mr. Bissonette filed no objections to the Suppression R&R.   (Docket 117 at p. 1 n.1).   The government filed no objections to the Identification R&R. (Docket 120).

> 2.    The magistrate judge applied the wrong legal standard when the government failed to preserve all of the photographic evidence.

Id. at pp. 5 & 7).

The government filed three objections to the Suppression R&R.   (Docket 120).   Those objections claim the magistrate judge erred when she concluded:

> 1.    Mr. Bissonette had not been informed he had a right to refuse to consent to search;
>
> 2.    Mr. Bissonette's consent to search was not voluntarily made; and
>
> 3.    The government failed to establish consent by a preponderance of the evidence.

Id. at p. 1.

To resolve the parties' objections, the court must first conduct a *de novo* review of the evidence presented at the hearing.   The following statements of fact developed from the uncontested findings of the magistrate judge and the court's own additional findings constitute that *de novo* review.

**STATEMENT OF FACTS**

At approximately 4 a.m. on August 8, 2013, Jackie Janis reported to law enforcement she had been sexually assaulted by a man who had offered her a ride home but instead took her into the country and assaulted her.   (Docket 115 at p. 2).   She described the driver's pickup as black or dark in color.   Id.

While the assault was occurring, Ms. Janis struck the man with a small, portable propane tank.   Id.   She was then able to escape from the pickup.   Id.

Not wanting to be left alone out in the countryside, Ms. Janis jumped into the box of the pickup as it drove off.   Id.

While going through the East Ridge trailer court the driver slowed and Ms. Janis jumped from the back of the pickup   Id.   At some time she had lost one of her sandals and her cell phone in the pickup.   Id.   She described the sandal as being white with yellow straps.   Id.   Once out of the pickup, Ms. Janis asked some bystanders if they knew the name of the driver of the pickup. Id.   The bystanders gave her the man's name and identified him as a mechanic who lived in the housing area.   Id.   Because the bystanders refused to provide her any assistance, Ms. Janis walked to the nearby convenience store and contacted law enforcement.   Id.

During the initial interview, Ms. Janis appeared upset, distraught and crying.   (Docket 111 at p. 40:14).   She also appeared to be intoxicated, although during the interview the officers could understand her.   Id. at p. 40:15-19.   Ms. Janis was unable to recall the name given to her, but she remembered the bystanders indicated he was a mechanic living in East Ridge. (Docket 115 at p. 2).   Law enforcement took Ms. Janis to the trailer court to show them where she got out of the pickup and where the bystanders were.   Id. Ms. Janis was then taken to the Indian Health Service hospital to receive medical attention.   Id.

While Ms. Janis was at the hospital, Officers Whary and Jack discussed who may be a possible suspect of the assault.   Id. at p. 3.   They identified

Dominic Waters and Ryan Bissonette as two mechanics known to live in East Ridge housing.   Id.   Photographs were taken of a black GMC Jimmy pickup and a dark colored Sonoma pickup parked at Mr. Waters' residence.   Id.

Officer Whary decided to go the police department and selected five photographs to show to Ms. Janis.   Id.   He chose mug shots of Mr. Waters and Mr. Bissonette because they were both mechanics living in the trailer court, and chose three other Native American men of a similar appearance with short hair. Id. at p. 3 & Docket 116 at p. 3.   Officer Jack recalled Ms. Janis told them her assailant had short hair, but Officer Whary did not recall Ms. Janis giving them a physical description of her assailant.   (Docket 116 at p. 3).   Each of the five selected photographs was a mug shot in front of a height chart and consisted of frontal and profile presentations.   Id.   All of the men depicted were of approximately the same size and height, except Mr. Waters who was a little heavier.   Id.   All of the photographs contained the names of the individuals portrayed and the date the mug shot was taken.   Id.; see also Exhibit 10 and Docket 111 at pp. 96:11-19 & 130:1-7.   Mr. Bissonette's mug shot showed him wearing a plain, white t-shirt and Mr. Bissonette appeared in jail stripes. Exhibits 10 & 11.[2]

---

[2]Exhibit 10, Mr. Bissonette's mug shot, is the original copy made during the investigation and Exhibit 11, Mr. Waters' mug shot, is a blow-up of the original mug shot.   (Docket 111 at pp. 12:6-11 & 71:18-25).   The blow-up photograph of Mr. Waters' mug shot was apparently created just prior to the suppression hearing.   Id. at p. 83:22-24.

Officer Whary took the two vehicle photographs and five line-up photographs to Ms. Janis at the hospital.[3]   Officer Whary laid out the five photographs before Ms. Janis and asked "Can you identify your attacker from these photographs."   (Docket 116 at p. 4) (referencing Docket 111 at p. 16:1-2). She looked over the photographs laid out before her and when she saw the photograph of Mr. Bissonette "almost immediately . . . hit her hand on the photograph and became irate and said 'That's the [expletive] that did it to me.' " Id. (referencing Docket 111 at p. 16:13-15).

At the officer's instructions, Ms. Janis circled the profile and frontal photographs of Mr. Bissonette, signed and dated the photograph.   Id.   Because Officer Whary believed he would not need the other four photographs, they were disposed of.   Id.   The officer testified it may have been a mistake to dispose of the photographs but it was not done to hide anything.[4]   Id.   Officer Whary does not remember the names of the other three individuals included in the photographic line-up.[5]   Id.

---

[3]Officer Jack went to the hospital but stayed outside on a smoke break and did not accompany Officer Whary into Ms. Janis' room.   (Docket 111 at p. 148:1-4).   Officer Jack was not present during the ensuing photographic presentation to Ms. Janis.   Id.

[4]The Oglala Sioux Tribe Department of Public Safety did not have a policy or protocol for conducting photographic line-ups.   (Docket 116 at p. 4).

[5]Mr. Bissonette's name was never mentioned by either Officer Whary or Officer Jack in the presence of Ms. Janis.   (Docket 111 at pp. 99:6-8 & 111:7-9).

Ms. Janis identified Exhibit B as a photograph of the vehicle which her assailant had been driving.[6]   (Docket 115 at p. 3).   Based on this photographic identification, Officers Whary and Jack obtained a tribal search warrant to search the black 1995 GMC Sonoma pickup parked at Mr. Waters' residence. Id.   When the search uncovered nothing, Mr. Waters pointed the officers to a nearby trailer where another dark colored pickup belonging to Mr. Bissonette was parked.   Id. at p. 4.

Officers Whary and Jack, together with Bureau of Indian Affairs Agent Hooper went to Mr. Bissonette's residence.   Id.   Mr. Bissonette's black Chevrolet pickup was parked in the driveway.   Id.; see also Docket 116 at p. 5. As the officers approached the residence, Officer Jack looked into the pickup to see if Mr. Bissonette was inside.   (Docket 115 at p. 4).   Officer Jack observed a white sandal with yellow straps in the backseat of the pickup.[7]   Id.   He reported this finding to Officer Whary and Agent Hooper.   Id.

Officer Whary knocked on the front door of the trailer and a family member of Mr. Bissonette opened the door.   Id. at p. 6.   The officer asked if Mr. Bissonette was home.   Id.   A family member went to the back of the trailer and woke up Mr. Bissonette.   Id.   As he approached Officer Whary, Mr. Bissonette was advised he was being detained and handcuffed but not arrested.   Id.   Once

---

[6]Exhibit B is a blurry, partial view of a black or dark blue pickup parked next to a bright blue house.   See Exhibit B.

[7]A photograph taken later, before entry of the vehicle occurred, shows the presence of the sandal in the backseat of the pickup.   (Exhibit 8).

he was escorted outside, Agent Hooper asked if the black pickup in the driveway belonged to Mr. Bissonette.   Id.   Mr. Bissonette said the pickup belonged to him, but that it was registered to someone else.   (Docket 111 at p. 185:19-23). Agent Hooper asked Mr. Bissonette for consent to search the pickup.[8]   (Docket 115 at p. 6).   The encounter between Mr. Bissonette and Agent Hooper was not confrontational.[9]   (Docket 111 at p. 190:2-4).   Mr. Bissonette had an odor of alcohol about him, but Agent Hooper did not believe he was intoxicated.[10] (Docket 116 at pp. 6-7).   The request for consent to search Mr. Bissonette's pickup occurred less than five minutes after he was awakened.   Id. at p. 6.

Mr. Bissonette orally agreed to a search of his pickup and the handcuffs were removed so he could complete the consent form.   (Docket 116 at p. 7).   A consent to search form was prepared by Agent Hooper.   (Docket 111 at p. 186:3-4).   While the agent was filling out the form, Mr. Bissonette provided his Social Security number.   Id. at p. 187:7-14.   Mr. Bissonette signed his name and filled in his telephone number on the consent to search form.   (Docket 111 at p. 187:17-20; see also Exhibit 1).   Both Mr. Bissonette's signature and telephone number on the form are legible.   (Exhibit 1).

---

[8]The officers did not have a warrant to search Mr. Bissonette's residence or vehicle.   (Docket 115 at p. 4).

[9]Agent Hooper knew Mr. Bissonette dropped out of school during the eleventh grade and that his only prior experience with the legal system occurred in tribal court.   (Docket 111 at pp. 233:5-6 & 234:16-18).

[10]Even though the agent did not believe Mr. Bissonette was intoxicated, the agent did not feel comfortable allowing Mr. Bissonette to drive himself to a subsequent interview at the BIA office.   (Docket 115 at p. 7).

While the search of the pickup was occurring, Mr. Bissonette's girlfriend asked law enforcement if it would be possible to remove some childcare items from the pickup.   Id. at p. 24:1-5.   While Mr. Bissonette was standing next to the pickup, his girlfriend removed several items from the back of the pickup. (Docket 115 at p. 8; see also Docket 111 at p. 24: 6-8 and Exhibits 7 & 9). Because Mr. Bissonette was becoming fidgety, almost agitated, he was placed in a patrol car for officer safety until the pickup search was completed.   (Dockets 115 at p. 8; 111 at pp. 24:11-15 and 67:3-12).   The search of the pickup resulted in the seizure of the white sandal with yellow straps and part of a black cell phone.   (Docket 115 at p. 8).

## DEFENDANT'S OBJECTIONS

Mr. Bissonette claims the magistrate judge erred in finding Mr. Bissonette failed to meet his burden of proof that the photographic line-up was impermissibly suggestive.   Each of his objections will be separately analyzed.

1.   THE PHOTOGRAPHS WHICH WERE RETAINED SHOW THE DEFENDANT WAS ENGAGED IN WRONGDOING OR WAS THE SUSPECT

Mr. Bissonette argues that his photograph showed him "wearing a white t-shirt, while Mr. Waters' [photograph] is in 'stripes,' indicating that he was in custody."   (Docket 117 at p. 6).   Mr. Bissonette asserts "the confirmed temporal custodial status of the individual" and the fact that Mr. Bissonette's photograph had a date and time entry on it, while Mr. Waters' photograph did not, were improper influences on Ms. Janis' identification.   Id.

9

What Mr. Bissonette fails to acknowledge is that Officer Whary testified each of the five photographs he selected was a mug shot with the individual in front of a height chart and consisted of frontal and profile presentations. (Docket 116 at p. 3).   It was only in preparation for the suppression hearing that the photograph of Mr. Waters was pulled from the police system and enlarged. (Docket 111 at p. 83:22-24).   Whether the other three individuals were in white t-shirts, other street clothes or jail stripes is unknown, as no testimony was presented at the suppression hearing on this subject.   What is clear from the testimony is that all five photographs showed Native American males who at one time or another were obviously in custody at the tribal jail.

Mr. Bissonette's suggestion that his photograph showed he had been arrested and in custody in this case is misplaced.   The date of his photograph was October 17, 2011, approximately 22 months prior to the alleged assault of Ms. Janis.   (Exhibit 10).

To suggest these factors created an impermissibly suggestive indicator that Mr. Bissonette was the perpetrator is without merit.   The five photographs, without any significant difference in appearance, did not tend to isolate or focus Ms. Janis on Mr. Bissonette's photograph.   United States v. Harris, 636 F.3d 1023, 1026 (8th Cir. 2011).   There is no evidence that "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."   Neil v. Biggers, 409 U.S. 188, 197 (1972) (citing Simmons v. United States, 390 U.S. 377, 384 (1968)).

10

Ms. Janis spent some "time with her assailant . . . [and] faced him directly and intimately.   She was no casual observer . . . [and] [s]he had 'no doubt' " that Mr. Bissonette was the perpetrator of the assault.   Id. at 200-01.

The magistrate judge properly analyzed these facts under the applicable law and concluded "Mr. Bissonette has failed to meet his burden that the photographic spreads were impermissibly suggestive."   (Docket 116 at p. 8). The court agrees with this analysis and adopts the magistrate judge's finding.

Mr. Bissonette's first objection to the Identification R&R is overruled.

2.   THE MAGISTRATE JUDGE APPLIED THE WRONG LEGAL STANDARD WHEN THE GOVERNMENT FAILED TO PRESERVE ALL OF THE PHOTOGRAPHIC EVIDENCE

Mr. Bissonette claims the magistrate judge should have applied the analysis performed in United States v. Honer, 225 F.3d 549 (5th Cir. 2000), when resolving how the government's failure to preserve the photographic evidence impacted the impermissibly suggestive analysis.   (Docket 117 at p. 7).   He argues the magistrate judge erred by applying United States v. Peneaux, 538 F. Supp. 3d 1177 (D.S.D. 2008), thus compelling Mr. Bissonette to "prove a negative."   Id.   He claims he "is left to confront eye witness testimony upon eye witness testimony . . . ."   Id.   Mr. Bissonette suggests the court should adopt "a presumption of impermissible suggestiveness when the government destroys a photo array used for identification."   Id. at p. 8 (referencing Honer, 225 F.3d at 553) ("when the government fails to preserve the photographic array used in a

11

pretrial line-up there shall exist a presumption that the array was impermissibly suggestive.") (internal quotation marks and italics omitted).

In addition to Peneaux, the magistrate judge considered Sales v. Harris, 675 F.2d 532 (2d Cir. 1982) and Montgomery v. Greer, 956 F.2d 677 (7th Cir. 1992).   In Sales, the United States Court of Appeals for the Second Circuit rejected a "conclusive presumption of suggestiveness from the failure of the police to preserve [a] photo array."   Sales, 675 F.2d 538 n.3 (rejecting Branch v. Estelle, 631 F.2d 1129 (5th Cir. 1980)).[11]   Nor did the Sales court "draw an inference of suggestiveness" based on the officer's failure to preserve the photographs.   Id. at p. 538.

Addressing the failure of the police to record which photographs were used for a line-up, the Montgomery court endorsed the trial court's determination that "absent a showing of bad faith" the police conduct did not violate the defendant's constitutional rights.   Id. at 679-81 (referencing Arizona v. Youngblood, 488 U.S. 51, 58 (1988) ("unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.").   "At most, [Montgomery] has demonstrated that the officer was negligent, and mere negligence, without more, does not amount to a constitutional violation."   Id. at 681 (referencing Youngblood, 488 U.S. at 58).

---

[11]Branch, 631 F.2d 1229, and United States v. Sonderup, 639 F.2d 294 (5th Cir. 1981), were the precedents upon which the Honer court concluded "when the government fails to preserve the photographic array used in a pretrial line-up there shall exist a presumption that the array was impermissibly suggestive."   Honer, 225 F.3d at 553 (internal quotation marks and italics omitted).

The <u>Montgomery</u> court also rejected "a per se rule" which would compel use of "a conclusive presumption of suggestiveness from the failure of the police to preserve the photo array."   <u>Id.</u> (adopting <u>Sales</u>, 675 F.2d at 538 n.3, and rejecting <u>Branch</u>, 631 F.3d at 1234).   The <u>Montgomery</u> court noted that the Sixth Circuit in <u>Kordenbrock v. Scroggy</u>, 919 F.2d 1091, 1103 (6th Cir. 1990) (*en banc*), and the Ninth Circuit in <u>Mitchell v. Goldsmith</u>, 878 F.2d 319, 322-23 (9th Cir. 1989) conducted the analysis compelled by <u>Youngblood</u>.   <u>Montgomery</u>, 956 F.2d at 681 n.4.

The United States Court of Appeals for the Eighth Circuit has not specifically addressed the issue presented in this case.   However, the Eighth Circuit has on numerous occasions addressed the failure of the police to preserve evidence in other settings.

In <u>United States v. Tyerman</u>, 701 F.3d 552 (8th Cir. 2012), the court addressed police destruction of a firearm.   "A due process violation arises from destruction of evidence when the evidence 'possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' "   <u>Id.</u> at 560 (citing <u>California v. Trombetta</u>, 467 U.S. 479, 489 (1984)).   "A higher standard of proof applies, however, when the evidence is only potentially useful to the defendant.   '[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.' "

13

Id. (citing Youngblood, 488 U.S. at 58).   "At most, the firearm was potentially useful to Tyerman.   Therefore, he must demonstrate that the government acted in bad faith by destroying evidence."   Id.   "Here, the ATF agent destroyed the firearm mistakenly, but not in bad faith.   The district court did not err by denying Tyerman's motion to dismiss for destruction of evidence."   Id.   See also United States v. Boswell, 270 F.3d 1200, 1206-07 (8th Cir. 2001) (failure to prevent serum from evaporating is not a due process violation) and United States v. Iron Eyes, 367 F.3d 781, 786-87 (8th Cir. 2004) (failure to preserve a mattress for urine testing was the result of negligence, not bad faith, so no due process violation occurred).

In the present case, the magistrate judge "assum[ed] . . . a presumption of suggestiveness [was] established through the missing photos . . . ."   (Docket 116 at p. 9).   From this declaration, it is clear the magistrate judge applied Honer to the first step of the two-step analysis required by Schawitsch v. Burt, 491 F.3d 798, 802 (8th Cir. 2007) (the first step "is to determine whether the [photo] array was impermissibly suggestive.").   In other words, the magistrate judge adopted an analysis which the court believes the Eighth Circuit would not require a court to apply.

Having given Mr. Bissonette the benefit of a presumption of suggestiveness, the magistrate judge then properly analyzed the facts under the second step of the Schawitsch inquiry.   (Docket 116 at p. 9) ("If the array was impermissibly suggestive, then the court considers 'whether under the totality of

14

the circumstances the array created a substantial risk of misidentification at trial.' ") (Schawitsch, 491 F.3d at 802).

The factors to be considered in the totality of the circumstances are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."   Biggers, 409 U.S. at 199-200.   See also Manson v. Brathwaite, 432 U.S. 98, 114 (1977) (the Court analyzed the same five factors).

The magistrate judge considered the evidence in light of the Biggers factors.   (Docket 116 at pp. 9-10).   At step two the magistrate judge concluded "[c]onsidering the totality of the circumstances as well as the Biggers and Manson factors, Janis' identification of Mr. Bissonette was reliable."   (Docket 116 at p. 9).   This finding satisfies the requirement that "a pretrial identification by photograph will be set aside . . . only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."   Simmons, 390 U.S. at 384.   See also Schawitsch, 491 F.3d at 802 ("a substantial risk of misidentification at trial.").

Whether Ms. Janis' identification of her alleged assailant was accurate remains a jury question.   Mr. Bissonette "will have an opportunity to cross-examine [Ms. Janis] regarding her ability to perceive and recall the identity

of her alleged assailant[] at trial."   Peneaux, 538 F. Supp. 2d 1180.

Identification "evidence is for the jury to weigh."   Manson, 432 U.S. at 116.

Mr. Bissonette's second objection is overruled.

The Identification R&R is adopted in full

### **GOVERNMENT'S OBJECTIONS**

The government's objections to the Suppression R&R are that the magistrate judge erred when she concluded:

1.   Mr. Bissonette had not been informed he had a right to refuse to consent to search;

2.   Mr. Bissonette's consent to search was not voluntarily made; and

3.   The government failed to establish consent by a preponderance of the evidence.

(Docket 120 at p. 1).   The government filed these objections even though the magistrate judge found "that law enforcement did not violate the Fourth Amendment in arriving at the vantage point from which they plainly viewed the white sandal; the white sandal's incriminating nature was immediately apparent to the officer; and the officers had a legal right of access to the object."   (Docket 115 at p. 24).   The magistrate judge recommended the defendant's motion to suppress be denied.   Id.   The government's objections also seem irrelevant because Mr. Bissonette did not file any objections to the Suppression R&R and notified the court and government counsel of the defendant's decision before the government's objections were filed.   Compare Docket 117 at p. 1 n.1 and Docket 120.   Nonetheless, because the court must conduct a *de novo* review of the

16

evidence under 28 U.S.C. § 636(b)(1), the court will separately address each of the government's objections.

> 1. THE MAGISTRATE JUDGE ERRED WHEN SHE CONCLUDED MR. BISSONETTE HAD NOT BEEN INFORMED HE HAD A RIGHT TO REFUSE TO CONSENT TO SEARCH

The magistrate judge found Mr. Bissonette was never informed of his right to refuse to consent to the search of his pickup.   (Docket 116 at p. 10).   The government asserts this finding is in error because the consent to search form "advised the defendant of the right to refuse consent . . . [and that] [t]he Magistrate Judge failed to take into account this form in reaching its conclusion . . . ."   (Docket 121 at p. 7) (referencing Exhibit 1).

The consent to search form stated "I [name], phone # [], have been informed of my constitutional right not to have a search made of the property or premises specified below . . . ."   (Exhibit 1).   Contrary to the form's declaration that "I . . . have been informed of my constitutional right to not have a search" occur, Agent Hooper never specifically told Mr. Bissonette that he had a right to refuse to consent to the search of his pickup.   Id.   The form merely advised Mr. Bissonette that he had a constitutional right not to have his pickup searched, but the form did not advise him how he could invoke that right.

"Although the Constitution does not require proof of knowledge of a right to refuse as the *sine qua non*[12] of an effective consent to a search, . . . such

---

[12]"*Sine qua non*" is defined as "an essential condition; a thing that is absolutely necessary." www.oxforddictionaries.com/us/definition/american_english/sine-qua-non.

knowledge [is] highly relevant to the determination that there had been consent."
United States v. Mendenhall, 446 U.S. 544, 558-59 (1980) (internal quotation marks and citation omitted).   Although specific advisement of the right to refuse consent is not ultimately determinative of voluntariness of a consent to search, the absence of the advisement is "highly relevant to the determination."   Id. at 559.   Had the agent informed Mr. Bissonette he was free to withhold his consent to the search of his pickup, that evidence would "substantially lessen[] the probability that [the officer's] conduct could reasonably have appeared to [him] to be coercive."   Id.

Because of the absence of the specific advisement that Mr. Bissonette had the right to refuse to consent to the search, the magistrate judge's finding accurately described the status of the evidence at the time the consent to search form was executed.

The government's first objection is overruled.

2.   THE MAGISTRATE JUDGE ERRED WHEN SHE CONCLUDED MR. BISSONETTE'S CONSENT TO SEARCH WAS NOT VOLUNTARILY MADE

The government's third objection, that the government failed to establish consent by a preponderance of the evidence, is necessarily integrated into the court's examination of the government's second objection.

The government argues Mr. Bissonette's consent to search was voluntary because he said "yes," to the oral request to search, "voluntarily provided biographical information" for the consent to search form, the handcuffs were

18

removed so he could complete the form, and he filled in his telephone number and signed the form.   (Docket 121 at pp. 4-5).   The government asserts Mr. Bissonette's "brief, 5-minute detention before consent . . . does not warrant the conclusion his consent was involuntarily."   Id. at p. 11.   The government claims "[u]nder the totality of the circumstances, the numerous facts show[] the defendant's voluntary consent far outweigh those to the contrary. . . . The defendant's conduct . . . 'would have caused a reasonable person to believe that he consented.' "   Id. at p. 14 (citing United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001)).

The magistrate judge considered a number of factors in arriving at her conclusion the government failed to establish voluntary consent by a preponderance of the evidence.   Those factors are summarized as follows:

1. Mr. Bissonette was 34 years old;

2. He had an 11th grade education;

3. He had only minimal experience with the criminal justice system, and had no criminal record, beyond tribal arrests;[13]

4. He had no prior experience with consent and search matters;

5. He had been asleep when the officers entered his trailer;

6. He was placed in handcuffs and detained;

---

[13]The government argues Mr. Bissonette had "no fewer than 39 tribal arrests, ranging from liquor violations to driving under the influence to domestic abuse, child abuse, and first degree assault."   (Docket 121 at p. 10) (referencing "Pretrial Services Report (filed Sept. 5, 2014)").   No pretrial services reports appear in CM/ECF and there is no record in the transcript of the suppression hearing that the government asked the magistrate judge to take judicial notice of either a pretrial services report or defendant's tribal arrest record.

7.  He smelled of alcohol, although not visibly intoxicated;

8.  He was not advised of his <u>Miranda</u> rights;

9.  He was not advised that he had a right to not give consent to the search of his pickup;

10. The handcuffs were not removed until after his "oral consent," so that he could sign the consent form; and

11. All of these events, including the request for permission to search, occurred within five minutes of having been awakened.

(Docket 115 at p. 10).   The fact Mr. Bissonette was free to move about after he had "consented" to the search is not relevant to the inquiry of the voluntariness of the consent to search.   While the officers did not make any promises or misrepresentations to Mr. Bissonette, the magistrate judge found "the other factors demonstrating duress outweigh the absence of overt threats or promises."   Id.   While there is certainly evidence of voluntariness, the court cannot find that the magistrate judge erred in concluding the government failed to prove by the greater convincing weight of the evidence that Mr. Bissonette's consent was voluntary.

The government's second and third objections are overruled.

The Suppression R&R is adopted in full.

ORDER

Based on the above analysis, it is

ORDERED that the defendant's objections (Docket 117) to the Identification R&R are overruled.

20

IT IS FURTHER ORDERED that the Identification R&R (Docket 116) is adopted in full.

IT IS FURTHER ORDERED that the government's objections (Docket 121) to the Suppression R&R are overruled.

IT IS FURTHER ORDERED that the Suppression R&R (Docket 115) is adopted in full.

IT IS FURTHER ORDERED that the defendant's motion to suppress (Docket 96) is denied.

IT IS FURTHER ORDERED that the defendant's motion to exclude eyewitness identification (Docket 98) is denied.

Dated September 6, 2016.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE